# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔚𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## for the 𝔉𝔦𝔣𝔱𝔥 𝔚𝔦𝔯𝔠𝔲𝔦𝔱

United States Courts
Southern District of Texas
FILED

*September 10, 2025*

Nathan Ochsner, Clerk of Court

No. 24-20095

United States Court of Appeals
Fifth Circuit

**FILED**

August 12, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

RONALD DONELL BROWN,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CR-567-1

Before WIENER, DOUGLAS, and RAMIREZ, *Circuit Judges.*
DANA M. DOUGLAS, *Circuit Judge:*

Defendant-Appellant Ronald Donell Brown appeals the district court's denial of his motion to suppress and its grant of the Government's motion to dismiss Counts Three and Four of Brown's indictment. For the reasons that follow, we AFFIRM the ruling on Brown's motion to suppress, VACATE the ruling on the Government's motion to dismiss Counts Three and Four, VACATE the sentences as to Counts One and Two, and REMAND for the district court to make a discretionary determination as to which convictions—Counts One and Two or Counts Three and Four—should be dismissed, and to resentence accordingly.

No. 24-20095

## I

## A

Ronald Donell Brown was the leader and manager of a drug organization that trafficked illegal narcotics, including cocaine and marijuana, received from suppliers located primarily in Mexico. Brown arranged for the weekly transport of multi-kilogram shipments of narcotics from Houston, Texas, to Atlanta, Georgia. Specifically, Brown used members of his organization to transport drugs and money between the two states in suitcases and large duffel bags driven in tractor trailers. Brown also oversaw the operations of his drug trafficking organization by making frequent trips between Houston and Atlanta on commercial flights, often traveling under the pseudonym of "Dorsey Robinson." The total amount of cocaine distributed by Brown's organization was well in excess of 100 kilograms.

In April 2014, Eric Williams ("E. Williams"), a co-conspirator in Brown's drug trafficking organization, gave one of the tractor-trailer drivers, David Roberts, two large duffel bags containing approximately fifty-six kilograms of cocaine that Roberts was to transport to Atlanta. Shortly after receiving the cocaine, Roberts was robbed by another man, later identified by Roberts as Marcus Celestine, an associate of Brown and someone Brown had known since childhood. Brown believed E. Williams and Celestine worked together to steal the cocaine. In retaliation, Brown sought to murder both men.

Brown and other members of his drug trafficking organization kidnapped E. Williams by binding his hands and feet with zip ties and forcing him into the trunk of a car. Brown planned to drive E. Williams to another location where he would be murdered. While en route to the intended murder location, E. Williams broke free of his restraints and escaped from

No. 24-20095

the trunk.  E. Williams then fled the scene on foot and encountered Richard Gordon, a good Samaritan and unrelated third party who offered to drive E. Williams to a place of safety.  Brown, who was armed with a handgun, pursued E. Williams.  Brown pulled up alongside Gordon's car and fired his weapon, striking E. Williams in the head and Gordon in the upper body.  Despite being shot, both men reached safety and reported the incident to the police before being transported to the hospital.

After the failed attempt to murder E. Williams, Brown sought the assistance of Raphael Risher, a person Brown grew up with and who was also involved in the drug trade, in finding someone to murder Celestine.  Risher contacted Clyde Williams ("C. Williams"), who agreed to murder Celestine.  Brown then provided a handgun to Risher, who passed the handgun to C. Williams.

Brown later phoned his parole officer to inquire about the date, time, and location of Celestine's next appointment with the Office of Probation and Parole.  Although unauthorized to do so, the parole officer told Brown that Celestine was scheduled to meet his parole officer at the Houston One District Parole Office on July 1, 2014.  Brown informed Risher of Celestine's parole meeting, and Risher passed the information along to C. Williams.

On the morning of July 1, 2014, C. Williams shot and killed Celestine as he sat in his vehicle in the parking lot of the Houston One District Parole Office.  Later that morning, Risher and C. Williams met Brown at a location on Highway 6 near Richmond, Texas, where Brown gave Risher and C. Williams approximately $20,000 for murdering Celestine.

Police later arrested Brown in September 2017 on charges unrelated to the instant case.  Brown was subsequently transferred into the custody of the United States Marshals Service.

3

No. 24-20095

B

A federal grand jury returned a twelve-count superseding indictment against Brown in November 2018. That indictment also charged C. Williams on four counts. Relevant to this appeal, Count One of the indictment charged Brown and C. Williams with conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958. Count Two charged them with intentional killing while engaged in drug trafficking, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Counts Three and Four charged that Brown and C. Williams "did aid and abet each other and did knowingly use, carry, brandish, and discharge a firearm . . . during and in relation to a crime of violence" causing death by murder, in violation of 18 U.S.C. § 924(c) and (j) and 18 U.S.C. § 2. The predicate crime of violence for Count Three was the conspiracy to commit murder for hire as charged in Count One, while Count Four was based on the murder and intentional killing of Celestine as charged in Count Two.

1

Before trial, Brown filed a motion to suppress evidence and requested an evidentiary hearing on taint. In his motion, Brown argued that federal agents acting through a confidential informant violated attorney-client privilege by intruding on privileged communications without obtaining court authorization. Brown further sought to suppress allegedly improperly obtained attorney-client communications under the Sixth Amendment.

At issue in his motion were two conversations, each involving Brown, his attorney, Chip Lewis, another attorney, Alicia O'Neil, and a fourth individual, referred to in this opinion as the "Confidential Informant" or "CI." The CI owned a Houston-based tax service and was looking for investors to help her open a school in Stafford, Texas. The husband of one of the CI's clients introduced her to Brown, who told her that he liked the

4

No. 24-20095

idea of investing in the school. According to the CI, she received a call from Brown on August 4, 2013, asking her to attend a meeting with Brown at his attorney's office later that same day.

The CI was under the impression that the meeting would be about Brown's investment in the school. But soon after the meeting began, it became apparent to the CI that this was not the true purpose of the meeting. Instead, Brown and the attorneys began discussing a large sum of money— $718,407—that Department of Homeland Security Investigations ("HSI") agents in Texas had seized the day before, on August 3, during a traffic stop of a vehicle driven by Jeffrey Hughes, one of Brown's drivers. During the meeting, Brown called Hughes from his cell phone and placed the call on speaker so the others could listen. Hughes described the traffic stop, the consensual search of the vehicle, the discovery of a suitcase containing the money, and law enforcement's seizure of that money.

After the phone call with Hughes, Brown and Lewis began discussing how the CI could claim the seized currency as her own in exchange for which Brown could give the CI a percentage as an investment in her school. Lewis asked the CI for her contact information and told her that an attorney would be contacting her about petitioning for the currency.

The CI left the meeting feeling confused and concerned about the illegality of the plan to recover the seized money. The following day, the CI contacted an FBI agent whom she previously worked with and told that agent about what had transpired. The CI then met with HSI Special Agent Todd Perzigian and FBI Special Agent Jack Walker on September 9, 2013, and described to them the August 4 meeting with Brown, Lewis, and O'Neil. The CI told the agents that Brown was the true owner of the $718,407 seized by HSI agents on August 3, and that Brown and Lewis were conspiring to obtain the seized money by having the CI file a fraudulent petition. The CI

No. 24-20095

also informed the agents that Brown routinely spoke to her about his drug business, stating that Brown traveled weekly to Atlanta to facilitate the drug business, he dealt in large quantities of cocaine and marijuana, and Hughes was not the only driver who worked for Brown. After the September 9 meeting with Agents Perzigian and Walker, the CI began working with another agent to record her conversations with Brown and the attorneys.

The CI, Brown, Lewis, and O'Neil next met at Lewis's office on September 17, 2013, to discuss the CI's filing of the petition. The CI recorded that meeting. The attendees discussed possible narratives for explaining how the CI and Hughes were connected and the CI's claim to the money. Lewis also cautioned the CI and Brown that the government would likely investigate the authenticity of any information provided as justification for the petition and that the CI could be deposed under oath and subject to criminal penalties for perjury. After the meeting, and outside the presence of the two attorneys, Brown and the CI continued their conversation about the petition.

According to Brown, federal agents acting through the CI violated attorney-client privilege and the Sixth Amendment by intruding on the August 4 and September 17 meetings, and certain Government witnesses and exhibits related to this unlawful intrusion constituted "fruit of the poisonous tree."[1] Brown specifically argued in his suppression motion that a violation of attorney-client privilege occurred when the Government, through the CI, improperly obtained his admissions of past criminal conduct made to the attorneys in pursuit of legal advice. This breach, Brown asserted, further led

---

[1] Brown sought to suppress Government Witnesses #1–7 and Exhibits #1–6. Witnesses 1–3, 5, and 6 were law enforcement officers investigating the 2013 money seizure; Witness 4 was Hughes; and Witness 7 was the CI. The exhibits were documents related to the August 3 cash seizure.

No. 24-20095

to the Government learning of protected attorney-client communications in violation of the Sixth Amendment right to counsel. Brown therefore sought to suppress all evidence derived directly and indirectly from the purported attorney-client privilege breach and Sixth Amendment violation.

The district court denied Brown's motion, concluding that Brown had failed to show that the August 4 and September 17 communications at issue were protected by attorney-client privilege, and that Brown failed to establish the requisite prejudice for his Sixth Amendment claim. *United States v. Brown*, No. H-17-567-1, 2023 WL 5939892, at *3–11 (S.D. Tex. Sept. 12, 2023).

2

Brown's jury trial commenced in October 2023.[2] Towards the end of his trial, the Government moved to dismiss Counts Eight through Twelve of the superseding indictment, which the district court granted. The jury convicted Brown on all seven remaining counts.

Brown subsequently moved to vacate Count One or Two on double jeopardy grounds, arguing that the two convictions were multiplicitous and resulted in impermissible punishment under the Fifth Amendment. The district court denied Brown's motion to vacate on the eve of sentencing.

The next day, before Brown's sentencing hearing, the Government filed a motion to dismiss Counts Three and Four under Federal Rule of Criminal Procedure 48(a). It argued that sentencing Brown to the § 924(j) offenses charged in Counts Three and Four, as well as the lesser-included crimes of violence charged in Counts One and Two, would likely violate the

---

[2] C. Williams pleaded guilty to Count One, conspiracy to commit murder for hire. He entered into a cooperation agreement with the Government and testified at Brown's trial.

7

No. 24-20095

Fifth Amendment Double Jeopardy Clause. Thus, "to avoid litigation risk" and "cumulative punishment," the Government sought leave of court to dismiss the two greater-included § 924(j) offenses.

At sentencing, defense counsel requested a continuance to respond to the Government's motion to dismiss. Counsel also sought leave to amend the previously filed motion to vacate to incorporate the arguments raised in the Government's motion. Remarking that the Government had "set out a completely rational basis" for its motion and that Brown would not "be prejudiced by the dismissal of Counts [Three] and [Four]," the district court denied defense counsel's requested continuance and amendment.

The district court ultimately imposed concurrent sentences of life imprisonment on Counts One, Two, Five, and Seven, and a consecutive 120-month prison term on Count Six, followed by five years of supervised release. By separate written order, the district court dismissed Counts Three and Four on the Government's motion. Brown timely appealed, challenging the district court's rulings on his motion to suppress and the Government's Rule 48(a) motion to dismiss.[3]

## II

We begin with the district court's denial of Brown's motion to suppress. Our review is de novo for legal conclusions and clear error for factual findings. *United States v. Kendrick*, 980 F.3d 432, 439 (5th Cir. 2020). We will affirm the district court's denial of Brown's motion "if there is any

---

[3] To the extent Brown seeks to challenge the district court's denial of his motion to vacate Count One or Two or its denial of his request for an evidentiary hearing, Brown has failed to adequately brief these arguments, and they are therefore forfeited. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

8

No. 24-20095

reasonable view of the evidence to support the denial." *United States v. Gratkowski*, 964 F.3d 307, 310 (5th Cir. 2020) (citation modified).

## A

Brown first contends that the district court erred in holding that communications made during the August 4 meeting were not subject to attorney-client privilege.[4]

"The application of the attorney-client privilege is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *United States v. Murra*, 879 F.3d 669, 681 (5th Cir. 2018) (internal quotation marks omitted) (quoting *In re Auclair*, 961 F.2d 65, 68 (5th Cir. 1992)). To be afforded the protections of the attorney-client privilege, a defendant "must prove: (1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (emphasis omitted) (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)).

As to the first element, when a communication between attorney and client occurs in the presence of a third party who is not the attorney's client,

---

[4] Brown does not specifically challenge the district court's ruling that he is not entitled to attorney-client privilege for communications made during the September 17 meeting. Rather, Brown argues only that the district court erred in finding that he and the CI did not share a common legal interest. But the district court premised its ruling with respect to the September 17 communications on an entirely different finding: that the CI's "recording of the September 17, 2013, meeting [was] not a source of the information that Brown argue[d] breached the attorney-client privilege and violated his [c]onstitutional rights." *Brown*, 2023 WL 5939892, at *8. Brown has thus forfeited any argument concerning attorney-client privilege and the September 17 communications. *See Rollins*, 8 F.4th at 397.

No. 24-20095

the communication generally is not confidential, and the privilege is waived. *See United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976). As we explained in *Hodges, Grant & Kaufman v. United States*, 768 F.2d 719, 721 (5th Cir. 1985): "Because the privilege protects only confidential communications, the presence of a third person while such communications are made or the disclosure of an otherwise privileged communication to a third person eliminates the intent for confidentiality on which the privilege rests."

An exception to the waiver-by-third-party-presence rule applies when "a privileged communication is shared with a third person who has a common legal interest with respect to the subject matter of the communication." *Id.* This is known as the "common legal interest" or "joint defense" privilege. *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710–12 (5th Cir. 2001); *In re Auclair*, 961 F.2d at 69 & n.8. Under "our circuit precedents, the two types of communications protected under the [common legal interest] privilege are: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between *potential* co-defendants and their counsel." *In re Santa Fe*, 272 F.3d at 710 (citations omitted).

"With respect to the latter category, the term 'potential' has not been clearly defined"; "[h]owever, because the privilege is an obstacle to truthseeking, it must be construed narrowly to effectuate necessary consultation between legal advisers and clients." *Id.* (citation modified). Thus, "there must be a palpable threat of litigation at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation, before communications between one possible future co-defendant and another ... could qualify for protection." *Id.* at 711; *see also In re Auclair*, 961 F.2d at 69 (holding that the common legal interest privilege extends to communications made among

10

No. 24-20095

persons "who consult an attorney together as a group with common interests seeking common representation" in the face of imminent litigation).

Brown does not cite evidence suggesting that he and the CI shared a common interest in the subject matter of the August 4 communication: *i.e.*, the seized money and Brown's efforts to reclaim that money. Conversely, the district court recounted the ample record evidence supporting the lack of a common legal interest among Brown and the CI. *Brown*, 2023 WL 5939892, at *7–8. For instance, the CI's swift reporting to and cooperation with the FBI indicates that the CI had no common or joint interest in Brown's scheme to reclaim the seized money. *See id.* at *7. The lack of common legal interest is also demonstrated by the CI's interviews with FBI agents and the prosecution, which, as the district court described, "show that Brown lured [the CI] to the August 4, 2013, meeting under the pretense that he was interested in investing in a school that [the CI] was trying to open and that the discussion with Lewis would be about paperwork for such an investment." *Id.* Because the CI had no prior knowledge of the meeting's true purpose, it cannot be said that she shared a common interest in that purpose. *Cf. Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977) (per curiam) (explaining that the common legal interest privilege applies when "the exchange is made for the limited purpose of assisting in [a] common cause").

Brown alternatively offers a different common legal interest that he and the CI purportedly shared: Brown's proposed investment in the CI's school. The record suggests that insofar as the meeting attendees discussed the investment at the August 4 meeting, it was in the context of Brown urging the CI to file a fraudulent petition for the seized money, after which Brown would give the CI a percentage of the amount as an investment in her school. But it cannot be said that any significant purpose of the August 4 meeting was to discuss Brown's investment in the school. As Brown readily admits, the

No. 24-20095

meeting centered on the seized money and Brown's attempts to reclaim that money. Any discussion of the investment was in reference only to a potential workaround for the legal predicament facing Brown, not the CI.

Additionally, at the time of the August 4 meeting, there was no "palpable threat of litigation" that would make Brown and the CI "potential co-defendants" in civil or criminal proceedings. *In re Santa Fe*, 272 F.3d at 710–11. Although Brown and the attorneys may have been aware that the filing of a fraudulent petition "might some day result in litigation," *id.* at 711, that alone does not give rise to the protections of the common legal interest privilege. *See United States v. Newell*, 315 F.3d 510, 525 (5th Cir. 2002) ("[A] cognizable common legal interest does not exist if a group of individuals seeks legal counsel to avoid conduct that might lead to litigation, but rather only if they request advice to prepare for future litigation." (citation modified)). Accordingly, the district court did not clearly err in finding that Brown's communication with attorneys Lewis and O'Neil, in the presence of the CI, does not fall within the ambit of the common legal interest exception, and he is not entitled to the protections of the attorney-client privilege.

Despite Brown's argument to the contrary, our holding comports with the Supreme Court's decision in *Upjohn Co. v. United States*, 449 U.S. 383 (1981). There, the Supreme Court held that communications between corporate employees and corporate in-house counsel made during the course of an attorney-led internal investigation were protected by the attorney-client privilege. *Id.* at 391–94. The Court observed that, unlike "[i]n the case of the individual client [where] the provider of information and the person who acts on the lawyer's advice are one and the same[,] . . . [i]n the corporate context, . . . it will frequently be employees . . . who will possess the information needed by the corporation's lawyers." *Id.* at 391. Extending attorney-client privilege to those communications between employees and

No. 24-20095

corporate counsel, the Supreme Court explained, encourages the "full and frank" presentation of sound legal advice to corporate clients. *Id.* at 389, 392.

Unlike in *Upjohn*, the CI was not Brown's employee or agent and was not involved in any fact-finding or internal investigation covered by the attorney-client privilege. The CI knew nothing about the seized money discussed at the August 4 meeting, nor is there evidence that the CI provided attorneys Lewis and O'Neil with information that would have aided in their representation of Brown. *See id.* at 390–91. To the extent the CI engaged in any discussion of the purported scheme to claim the seized currency during the August 4 meeting, that is not the sort of protected fact-finding communication *Upjohn* contemplated. *See id.* at 389; *see also In re Burlington N., Inc.*, 822 F.2d 518, 524 (5th Cir. 1987) ("[B]ecause the client has no legitimate interest in seeking legal advice in planning future criminal activities, society has no interest in facilitating such communications." (citation modified)).

Brown's reliance on *In re Auclair*, 961 F.2d 65, is equally unavailing. That case involved a situation where multiple prospective clients "consult an attorney together as a group with common interests seeking common representation." *Id.* at 69. We held that under those circumstances, "the parties and the attorney may reasonably presume that the parties are seeking representation of a common or joint matter." *Id.* at 70. But *Auclair* concerned "the scope of the attorney-client privilege in an instance of declined representation"—an issue not present here. *Id.* at 69. Lewis already represented Brown, and the CI did not attend the August 4 meeting seeking joint legal representation or any legal representation for that matter.

Moreover, *Auclair* did not modify the general rule that waiver results from disclosure to third parties who have no common legal interest. As we previously discussed, Brown acknowledged that the communications made

No. 24-20095

during the August 4 meeting concerned the seized money and Brown's attempt to reclaim that money. Brown does not contend, nor does the record suggest, that the CI, in attending the August 4 meeting, sought consultation with attorneys Lewis and O'Neil on the seized money; rather, she attended that meeting with the belief that they would discuss Brown's potential investment in the school. Thus, unlike in *Auclair*, the CI here had no interest in the "legal" matter discussed.

As a disinterested party, the CI's presence rendered the August 4 meeting non-confidential and placed it outside the scope of the attorney-client privilege. Finding no clear error, we affirm the district court's denial of the motion to suppress with respect to Brown's assertion of the attorney-client privilege.

B

Brown next argues that the district court erred in denying his motion to suppress based on his Sixth Amendment claim concerning the Government's purported intrusion into attorney-client communications without a court order.

The Sixth Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. "A governmental intrusion 'through surreptitious electronic means or through an informant' upon 'the confidential relationship between a criminal defendant and his attorney' violates the Sixth Amendment right to counsel." *United States v. Diaz*, 941 F.3d 729, 738 (5th Cir. 2019) (per curiam) (quoting *United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970)).

An accused's right to counsel is, however, "limited by its terms." *Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008). "[I]t does not attach until a prosecution is commenced," meaning "the initiation of adversary

14

No. 24-20095

judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (first quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); and then quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). Our court has thus held that intrusions into conversations during "the investigatory phase" but before the defendant had been charged were not subject to Sixth Amendment protections. *E.g.*, *Diaz*, 941 F.3d at 739 (denying defendant Sixth Amendment protections for recordings taken about nine months before grand jury subpoena issued); *United States v. Carr*, 83 F.4th 267, 274–75 (5th Cir. 2023) (denying defendant Sixth Amendment protections for recordings of attorney-client conversations recorded almost a year before grand jury indictment).[5]

The conversations at issue in this case took place in 2013, more than four years before the return of Brown's grand jury indictment in 2017. Neither conversation transpired after Brown's right to counsel had attached,

---

[5] Brown argues that *Diaz* and *Carr* conflict with the Supreme Court's rulings in *Black v. United States*, 385 U.S. 26 (1966) (per curiam), and *Weatherford v. Bursey*, 429 U.S. 545 (1977). Neither case cited by Brown lends credence to his argument that the Sixth Amendment right arises before initiation of adversarial proceedings. In *Black*, a case that did not expressly concern the Sixth Amendment, the government belatedly disclosed the existence of FBI recordings of conversations between Black and his attorney "during the period the offense was being investigated and beginning some two months before and continuing until about one month after the evidence in this case was presented to the Grand Jury." 385 U.S. at 27. Notably, the Court's explanatory per curiam opinion did not rule that a constitutional violation had occurred; the Court simply set aside the case and ordered a new trial to afford Black "an opportunity to protect himself from the use of evidence that might be otherwise inadmissible." *Id.* at 27–29; *see also Weatherford*, 429 U.S. at 552 ("It is difficult to believe that the Court in *Black* . . . was evolving a definitive construction of the Sixth Amendment without identifying the Amendment it was interpreting . . . ."). And in *Weatherford*, the two pretrial meetings at issue, which the criminal defendant attended along with an undercover government informant and his trial counsel, occurred *after* the criminal defendant's arrest and indictment. 429 U.S. at 547–48.

No. 24-20095

*see Rothgery*, 554 U.S. at 198, and no Sixth Amendment violation occurred, *see Diaz*, 941 F.3d at 738–39; *Carr*, 83 F.4th at 274–75.

## III

We now turn to the district court's grant of the Government's motion to dismiss Counts Three and Four under Federal Rule of Criminal Procedure 48(a).

## A

Brown first argues that the district court erred in granting the motion without Brown's consent and over defense counsel's objection. Brown did not raise this argument before the district court, so plain error review applies. *United States v. Mendez*, 885 F.3d 899, 908 (5th Cir. 2018) (citing Fed. R. Crim. P. 52(b)).

Federal Rule of Criminal Procedure 48(a) provides that the Government "may, with leave of court, dismiss an indictment, information, or complaint" but "may not dismiss the prosecution during trial without the defendant's consent." Fed. R. Crim. P. 48(a). A plain reading of the Rule requires the Government to obtain a defendant's consent to the motion only "during trial," which supports that the Government merely needed "leave of court" in this case. *See id.* The Eighth Circuit has held as much, too. In *United States v. Williams*, 720 F.3d 674 (8th Cir. 2013), the court noted that "[a]lthough it is the rare case in which the prosecution will move to dismiss an indictment after a trial is complete and verdict rendered, Rule 48(a) requires the government to obtain the defendant's consent to dismiss the prosecution only 'during trial.'" *Id.* at 702–03 (quoting Fed. R. Crim. P. 48(a)). Because the defendant failed to cite any authority requiring the government to seek consent after trial, the Eighth Circuit concluded that "all that the government needed was leave of court, which the district court

16

No. 24-20095

granted." *Id.* at 703; *see also United States v. Bowser*, 318 F. Supp. 3d 154, 167 (D.D.C. 2018) (holding same).

Brown has likewise not cited any authority suggesting that his consent was a requisite to the court's granting of the motion made after a complete trial. The district court therefore did not plainly err in granting the motion to dismiss without Brown's consent.

## B

Brown next argues that the district court erred in dismissing Counts Three and Four rather than Counts One and Two.

### 1

As an initial matter, the parties dispute whether Brown sufficiently raised the instant challenge before the district court to preserve it for appeal.

Federal Rule of Criminal Procedure 51(b) provides that "[a] party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." As the Supreme Court has explained, "[b]y 'informing the court' of the 'action' he 'wishes the court to take,' a party ordinarily brings to the court's attention his objection to a contrary decision." *Holguin-Hernandez v. United States*, 589 U.S. 169, 173 (2020) (citation omitted) (quoting FED. R. CRIM. P. 51(b)). Thus, for preservation purposes, the relevant "question is simply whether the claimed error was 'brought to the court's attention.'" *Id.* at 174 (quoting FED. R. CRIM. P. 52(b)). "The objection and argument on appeal need not be identical; the objection need only give the district court the opportunity to address the gravamen of the argument presented on appeal." *United States v. Rodriguez-Leos*, 953 F.3d 320, 325 (5th Cir. 2020) (citation modified); *see also United States v.*

No. 24-20095

*Hernandez-Montes*, 831 F.3d 284, 290 (5th Cir. 2016) ("Key is whether the objection is specific enough to allow the court to take evidence and receive argument on the issue.").

Here, the record does not reflect that Brown expressly objected to the Government's motion to dismiss or the reasoning or arguments set forth therein. The record is also somewhat equivocal as to whether Brown argued that, under double-jeopardy principles, the district court had to, or should, dismiss Counts One and Two instead of Counts Three and Four. But is Brown to blame for the lack of specificity in his argument given the Government's last-minute filing of its motion to dismiss on the morning of sentencing? We think not.

Defense counsel had only a short window of time to prepare a responsive argument, and counsel certainly had insufficient time to articulate his position in the form of a written and filed response before the 2:00 p.m. sentencing hearing. Indeed, at sentencing, defense counsel requested a continuance to respond, which the district court denied. By declining Brown and his counsel a meaningful opportunity to respond, the district court foreclosed Brown's ability to more fulsomely and clearly present his objections to the Government's motion. *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1176–77 (5th Cir. 2006) (noting the importance of prior notice and an opportunity to respond). Under these circumstances, the issue is deemed preserved for appeal even absent an express objection. *See United States v. Diggles*, 957 F.3d 551, 559 (5th Cir. 2020) (en banc) ("[W]e do not review for plain error when the defendant did not have an opportunity to object in the trial court."); *United States v. Dean*, 940 F.3d 888, 890 (5th Cir. 2019) ("When a defendant has not been provided a meaningful opportunity to object, this Court reviews sentencing for an abuse of discretion."); *United States v. Riojas-Flores*, 834 F. App'x 120, 120 (5th Cir. 2021) (per curiam)

No. 24-20095

(reviewing for abuse of discretion when defendant "did not have a meaningful opportunity to object in the district court").

And regardless, a review of the record with an eye toward preservation suggests that Brown sufficiently raised the argument now pressed on appeal. Before the district court denied the requested continuance, defense counsel asserted that the Government's motion raised "an issue regarding double jeopardy." Specifically, the Government's motion conceded that based on the Supreme Court's ruling in *Lora v. United States*, 599 U.S. 453 (2023),[6] "logic suggests that the Double Jeopardy Clause prohibits cumulative punishment for offenses under [18 U.S.C. §] 924(j) and lesser-included offenses, including predicate crimes of violence or drug trafficking crimes."[7] So, sentencing Brown to both Counts One and Two, the predicate crimes of violence, *and* Counts Three and Four, the § 924(j) offenses, would lead to potential double-jeopardy concerns, the Government said. Importantly, the Government asserted that the proper remedy to this multiplicity issue was to

---

[6] The Court in *Lora* considered whether the bar on concurrent sentences in 18 U.S.C. § 924(c) extends to a sentence imposed under § 924(j) and unanimously held that it did not. 599 U.S. at 455, 459. Although *Lora* did not address the double-jeopardy question at issue here, both parties cite that decision for the argument that Congress did not intend for multiple punishments for a § 924(j) violation and the predicate crime of violence. Just as subsection (c) includes an express concurrent-sentence bar that subsection (j) does not, subsection (c) likewise includes an express provision permitting cumulative sentences that subsection (j) does not. *Compare* 18 U.S.C. § 924(c) (providing for imposition of sentence under § 924(c) "in addition to the punishment provided for such crime of violence or drug trafficking crime"), *with id.* § 924(j) (authorizing sentence of life imprisonment or death, without reference to the imposition of any other sentence). Therefore, in accordance with *Lora*, the parties assert that § 924(j) should not be read to permit cumulative punishment. Our recent decision in *United States v. Sanders*, 133 F.4th 341 (5th Cir. 2025), supports the parties' reading of *Lora*. *See id.* at 370 (holding that a charged predicate crime of violence "did not require proof of a fact that § 924 did not," and so "the offenses fail[ed] the elements test under *Blockburger*").

[7] ROA.1676.

19

No. 24-20095

dismiss Counts Three and Four (*i.e.*, the greater offenses) and sentence Brown on Counts One and Two (*i.e.*, the lesser offenses).

Although defense counsel did not expressly object to the Government's request to dismiss Counts Three and Four, counsel reasonably brought that objection to the district court's attention. Notably, defense counsel expressed at sentencing his agreement with the logic underlying the Government's motion to dismiss: that Counts One and Two and Counts Three and Four are multiplicitous, and that sentencing Brown on all four counts would violate the Double Jeopardy Clause. Yet, despite agreeing with the legal basis for the Government's requested dismissal, defense counsel did not simply express no objection to the motion; rather, defense counsel explicitly requested leave to file a response. This should have made clear to the district court that defense counsel disputed, at least implicitly, some aspect of the Government's motion. And the only portion of the motion that defense counsel did not express agreement with during sentencing was the Government's position that the district court should dismiss Counts Three and Four. As such, a district judge would "ordinarily understand" that Brown was making the argument that it should not dismiss Counts Three and Four at the Government's behest. *See Holguin-Hernandez*, 589 U.S. at 173–74 (finding issue preserved when the judge would "ordinarily understand that a defendant . . . was making the argument" now pressed on appeal even though not expressly raised).

Brown also asked to amend his previously filed motion to vacate, arguing that the Government's Rule 48(a) motion "directly implicates the double jeopardy clause under the multiplicity argument" set forth in his motion. Brown's request to amend reasonably informed the district court that he did not wholly agree with the Government's motion to dismiss; namely, Brown did not accept that the proper resolution of the purported multiplicity issue was the dismissal of Counts Three and Four rather than

No. 24-20095

Counts One and Two.[8]  This is particularly evident given that in the motion to vacate that he invoked at sentencing and sought leave to amend, Brown emphasized that the remedy for multiplicitous sentences was that the district court—not the Government—should decide which conviction to vacate.

Further, Brown arguably raised the core of his appellate argument. He stated at sentencing that the Government's motion to dismiss implicated the Double Jeopardy Clause, multiplicity, and *Blockburger*, and he specifically maintained that Counts One and Two were lesser-included offenses of Counts Three and Four.  The district court apparently understood that, while Brown agreed there were multiplicity issues that prohibited the entry of judgment on all four counts at issue, he challenged that the proper remedy was to dismiss Counts Three and Four.  The court responded that it effectively had to grant the Government's motion absent a showing of bad faith or disservice to the public interest, that the Government offered a seemingly valid rationale, and that Brown would not be prejudiced by the dismissal of Counts Three and Four.[9]

Thus, even if Brown was not deprived of a meaningful opportunity to object, he properly brought the gravamen of his argument to the district court's attention, and he has sufficiently preserved this claim of error for appeal.  *See* FED. R. CRIM. P. 51(b); *Holguin-Hernandez*, 589 U.S. at

---

[8] At sentencing, Brown's attorney requested to amend the motion to vacate to address the argument raised in the Government's motion—*i.e.*, that Counts Three and Four are the greater-included offenses for Counts One and Two, respectively.  The attorney conceded that he "didn't quite pick . . . up" on that argument when he initially filed Brown's motion to vacate.

[9] Notably, the Government also appears to acknowledge that Brown raised some version of his appellate argument in the district court.  *See* Gov't Brief at 63 (stating that Brown's appellate argument "vastly enlarges . . . the new double jeopardy theory he raised at sentencing").

21

No. 24-20095

173–74; *Rodriguez-Leos*, 953 F.3d at 325. We therefore review his challenge for abuse of discretion. *See United States v. Jones*, 664 F.3d 966, 973 (5th Cir. 2011).

2

The crux of Brown's argument is that the district court erred in dismissing Counts Three and Four, instead of the lesser-included offenses charged in Counts One and Two. Brown does not contest whether the Government made its motion in bad faith, or whether the motion was well supported and consistent with the public interest. Indeed, both parties agree that punishing Brown for the § 924(j) offenses as well as the predicate crimes of violence would violate the Double Jeopardy Clause. Our precedent supports the parties' position. *See United States v. Sanders*, 133 F.4th 341, 370–71 (5th Cir. 2025). So, the only question we must answer is whether the district court, in granting the Government's Rule 48(a) motion, properly dismissed Counts Three and Four, rather than Counts One and Two.

A Rule 48(a) motion implicates the Government's exercise of its discretion to decide whether to dismiss a pending prosecution. The Government's position concerning whether to end the prosecution of certain crimes is given deference because it has the prerogative to decide how to prosecute offenses and when to dismiss charges. *See United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975). But here, the Government was not simply exercising its discretion as to what charges to pursue or which offenses to prosecute. A jury had already convicted Brown of all charged offenses, and the only remaining question before the district court was on what counts of conviction he should be sentenced. The record therefore reflects that the Government filed its motion to dismiss Counts Three and Four not due to considerations as to whether Brown should be subject to prosecution for those counts but rather because of concerns as to the punishment that would

No. 24-20095

be imposed and the availability of specific sentencing options. If the Government's motive had simply been to avoid a potentially cumulative punishment, dismissal of either Counts One and Two *or* Counts Three and Four would have achieved its objective.

Instead, the Government's motion limited the district court's sentencing options. As Brown observes, the counts the Government moved to dismiss did not require the imposition of a minimum prison term. Offenses under § 924(j) predicated on murder—such as Counts Three and Four—are to "be punished by death or by imprisonment for *any term of years* or for life." 18 U.S.C. § 924(j)(1) (emphasis added). By contrast, the lesser-included counts the Government did not move to dismiss each carried a mandatory prison term. Count One, the offense of conspiracy to commit murder for hire, has a mandatory sentence of life imprisonment when, as here, death results. *Id.* § 1958(a). Count Two, the crime of aiding and abetting an intentional killing while engaged in drug trafficking, is punishable by "a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment." 21 U.S.C. § 848(a).

By moving to dismiss the greater-included offenses that carry the term-of-years sentencing option, the Government attempted to take away the district court's discretion to sentence Brown to anything but an aggregate life sentence. *See Ball v. United States*, 470 U.S. 856, 864 (1985) (recognizing that "sentencing responsibility resides" with the district court). And the effect of the greater-offense dismissal was significant. Because Brown was subject to a mandatory term of life imprisonment for Count One, 18 U.S.C. § 1958(a), neither party offered sentencing arguments. Relatedly, the district court provided no analysis and made no findings as to the appropriate sentence, did not explain its choice of sentence, did not cite the 18 U.S.C. § 3553(a) factors, and did not note whether its choice of life imprisonment

No. 24-20095

for Counts Five and Seven was influenced by the fact that Brown was otherwise subject to a mandatory sentence of life imprisonment.[10]

The record also suggests that the district court, by accepting the rationale of the Government's Rule 48(a) motion and granting it, removed itself from the determination as to which of Brown's convictions should be invalidated. The Supreme Court has recognized that where, as here, the presumption against cumulative punishment requires the invalidation of a conviction, the district court must "exercise its discretion to vacate one of the underlying convictions." *Ball*, 470 U.S. at 864; *see also Lanier v. United States*, 220 F.3d 833, 841 (7th Cir. 2000) ("[W]hen the presumption against double punishment requires invalidation of the conviction for either the greater or lesser offense, the choice of which conviction to vacate rests with the sound discretion of the district court."). The district court in this case divested itself of its discretionary authority and instead permitted the Government to identify and determine which convictions to dismiss.[11]

In granting the Government's motion, the district court did not undertake any analysis of which counts should be dismissed or offer any indication that it made such a discretionary determination. To the contrary,

---

[10] Count Five charged Brown with aiding and abetting kidnapping, in violation of 18 U.S.C. §§ 1201 and 1202, punishable by imprisonment for any term of years to life. Count Seven charged Brown with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A), punishable by a term of imprisonment not less than ten years or more than life.

[11] Though the Government asserts that the prosecution is empowered to elect which multiplicitous count(s) to dismiss, the cases it cites are inapposite because, among other things, they do not involve the type of multiplicity at issue here: *i.e.*, convictions for greater- and lesser-included offenses. *See United States v. Meza*, 701 F.3d 411, 432–34 (5th Cir. 2012); *United States v. Osunegbu*, 822 F.2d 472, 481 (5th Cir. 1987); *United States v. Greer*, 46 F. App'x 225, 225 (5th Cir. 2002) (per curiam) (unpublished table decision).

No. 24-20095

the court simply stated that the Government had "set out a completely rational basis" for its motion and concluded that Brown "certainly" would not be prejudiced by dismissal of Counts Three and Four. In so doing, the district court allowed the Government to dictate a choice that, under *Ball v. United States*, should have been made by the court alone. *See* 470 U.S. at 864; *see also United States v. Peel*, 595 F.3d 763, 768 (7th Cir. 2010) ("[W]hich conviction must be vacated . . . is a matter committed to the trial judge's discretion because functionally it is a decision concerning the length of the defendant's sentence."); *United States v. Hector*, 577 F.3d 1099, 1101, 1103–04 (9th Cir. 2009) (noting that district courts must exercise discretion in determining which counts to vacate, even "where a defendant's conduct violated two statutes and the prosecutor decided the case warranted the more severe charge"). The district court's failure to exercise its vested discretion necessitates remand. *See Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 757 F.3d 416, 424–25 (5th Cir. 2014) ("When a district court fails to exercise its discretion . . . , this court remands the action to allow the district court to exercise it in the first instance." (citation modified)).

Brown further argues that the district court endorsed the dismissal of the wrong counts and that, on remand, the district court must dismiss Counts One and Two, not Counts Three and Four. As Brown observes, in cases such as this where the jury has rendered verdicts and found the defendant guilty of both the greater- and lesser-included offenses within the same indictment, district courts ordinarily should enter final judgments of conviction on the greater offenses and vacate the conviction on the lesser offenses. *See United States v. Brito*, 136 F.3d 397, 408 (5th Cir. 1998) (indicating that it is "well settled" that this court dismisses lesser-included offenses in cases of double jeopardy that arise from simultaneous charging of both greater and lesser-included offenses); *United States v. Michel*, 588 F.2d 986, 1001 (5th Cir. 1979)

No. 24-20095

(stating that the remedy for convictions on greater and lesser offenses is to vacate the conviction and sentence of the lesser-included offense).

But this is not a case where the lesser-included offenses carry lesser penalties. *See Peel*, 595 F.3d at 768 ("[U]sually it's the conviction carrying the lesser penalty that is vacated."); *cf. id.* ("[I]n a case in which the lesser-included offense has fewer elements *and* is the less serious offense, vacating the sentence for the graver offense would be an abuse of discretion."). Counts One and Two (the lesser-included offenses) carry mandatory prison terms, 18 U.S.C. § 1958(a); 21 U.S.C. § 848(a), whereas Counts Three and Four (the greater-included offenses) allow for "imprisonment for any term of years," 18 U.S.C. § 924(j)(1). Under these circumstances, the appropriate remedy is to remand for the district court to exercise its discretion in selecting which counts—whether the lesser- or greater-included offenses— to vacate. *E.g.*, *Peel*, 595 F.3d at 767–68 (remanding case for district judge to vacate one of two convictions rather than ordering vacatur of the lesser-included offense when that lesser offense, although "lesser in the sense of having fewer elements," carried with it the greater penalty). As the Sixth Circuit has explained, where an "anomaly in the sentencing guidelines" produces a longer sentence on a duplicative lesser-included offense than the greater offense, "it is a decision for the trial court" which offense to vacate. *United States v. Chambers*, 944 F.2d 1253, 1269 (6th Cir. 1991). We therefore express no opinion on which counts the district court "should" dismiss. *See United States v. Maier*, 646 F.3d 1148, 1154 (9th Cir. 2011) (recognizing that although ordinarily a "a district court 'should' exercise its discretion to vacate the lesser-included offense," there may be "unusual circumstances and compelling reasons to vacate the greater offense").

Accordingly, we vacate the district court's ruling on the Government's Rule 48(a) motion, vacate Brown's sentences as to Counts One and Two, remand with instructions for the district court to exercise its

26

No. 24-20095

discretion to dismiss either Counts One and Two or Counts Three and Four, and order resentencing.

IV

Based on the foregoing, we (1) AFFIRM the district court's denial of Brown's motion to suppress; (2) VACATE the district court's ruling on the Government's motion to dismiss Counts Three and Four; (3) VACATE the sentences as to Counts One and Two; and (4) REMAND for the district court to make a discretionary determination as to which convictions—Counts One and Two or Counts Three and Four—should be dismissed, and to resentence accordingly.

27